# Leech, et al. v. Farmers Tobacco Warehouse Company.

(Decided October 31, 1916.)

## Appeal from Madison Circuit Court.

1. Conspiracy—To injure Business—What Constitutes—Liability for.
—If two or more persons enter into a conspiracy for the purpose

of affecting injuriously or destroying the business of another person or corporation, and for the purpose of carrying it out circulate or cause to be circulated false and damaging reports concerning the person or corporation whose business it is sought to injure or destroy, or commit acts tending to accomplish the object of the conspiracy, and the effect of the reports or acts is to injure or destroy the business affected, the persons engaged in the conspiracy will be individually and jointly liable for the damages the aggrieved party has sustained.

2. Conspiracy—The Damage and Not the Conspiracy the Gist of the Offense.—In actions to recover damages sustained by a conspiracy to injure business, the damage and not the conspiracy is the gist of the offense. It is not actionable to enter into a conspiracy to injure the business of another unless as a result of the conspiracy the business has been injured.

3. Conspiracy—Evidence.—In conspiracy actions a wide latitude in the introduction of evidence tending to establish the conspiracy is admissible when the various facts and circumstances developed have a tendency to show the conspiracy, who the conspirators are and their evil purpose.

4. Conspiracy—Right to Suspend Business Relations.—Any person or any number of persons have the right at any time, either singly or in concert, to suspend for a time or abandon entirely their business relations with any other person, whether the suspension or abandonment is for a good cause or is the result of caprice, prejudice or malice, unless the suspension or abandonment is pursuant to a conspiracy entered into for the purpose of injuring the business and it has been injured.

5. Conspiracy—Suspension or Abandonment of Business Relations Does Not Constitute.—Any man or set of men has the right to sever business relations with any establishment because of objections to any person connected with it.

6. Conspiracy—Action May Be Prosecuted Against Individual Although Charge of Conspiracy Fails.—Although a conspiracy is charged, yet if upon the trial the evidence connects but one person with the action committed, the plaintiff may recover against him as if he had been sued alone.

7. Libel and Slander—Slander to Business—Action Lies for Damage to Business on Account of.—A person may be sued in slander for uttering words that are calculated to and do injure the business of another.

JOHN NOLAND, W. S. MOBERLY, ALLEN & DUNCAN **and** PENDLETON, BUSH & BUSH for appellants.

B. A. CRUTCHER and CHENAULT, WALLACE & WALLACE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This is a suit brought by the Farmers Tobacco Warehouse Company against J. S. Leech, J. S. Thomas, John Smith, individually and as agent of the J. P. Taylor Tobacco Co., Charles W. Stewart, individually and as agent of the E. J. O'Brien Company, and W. P. Judy, individually and as agent of the R. J. Reynolds Tobacco Co., to recover damages on account of an alleged conspiracy entered into by the persons named in their individual capacities to injure the business of the company. The Taylor Company, the O'Brien Company and the Reynolds Company were made defendants upon the theory that these companies were liable for the acts and conduct of their agents, Smith, Stewart and Judy, in their efforts to destroy the business and property of the tobacco company.

The petition was filed on March 2, 1914, and after setting out that the Farmers Tobacco Warehouse Co. was a corporation organized for the purpose of receiving, storing and selling on the floor of its warehouse, located in Richmond, Ky., tobacco of farmers who brought their tobacco to this house for sale, charged, in substance, that Leech and Thomas as individuals, and the Taylor Company through its agent, Smith, the O'Brien Company through its agent, Stewart, and the Reynolds Company through its agent, Judy, were engaged in 1913 and 1914, and had been for several years prior thereto, in the business of buying tobacco on the tobacco market in Richmond. That during the tobacco season of 1913-14 there were besides it two other tobacco warehouses in Richmond, to-wit: The Madison Tobacco Warehouse Co., and the Home Loose Leaf Warehouse Co., engaged in competition with each other in conducting the same character of business

That the defendants "did in January, 1914, maliciously, unlawfully and wickedly conspire, combine, confederate and agree together, between and among themselves to estrange and alienate the patrons of this plaintiff, both growers of tobacco and buyers of tobacco, and to oppose and ruin the trade with, and the good will towards the plaintiff; and to destroy it; and to drive the plaintiff completely out of business by circulating and causing to be circulated false and injurious reports against the plaintiff, such as that it should not be in the market at Richmond; that it was not needed; that it ought to be put out of business; that it would be put

out of business before a certain time; that the farmers should bring their tobacco to the Madison Tobacco Warehouse and the Home Loose Leaf Warehouse, as they could get a better price for their tobacco there; and that the plaintiff's officers and stockholders were thieves and robbers. That the defendants did on the 29th day of January, 1914, go out to the plaintiff's warehouse, for which day a sale of tobacco was scheduled, and by agreement, understanding and conspiracy by, between and among themselves, refused to bid reasonable prices for tobacco, made ridiculously low bids on tobacco that day, so as to make the sale at the plaintiff's house a perfect joke and a farce, and to embarrass the plaintiff's business and drive its patrons to the other two warehouses, and to discriminate against this plaintiff, to the benefit of the other said warehouse companies. That when said ridiculously low prices were bid by defendants, their bids were rejected by the growers, or those in charge of the sale, in accordance with the latter's rights. The defendants, without any fault on the part of the plaintiff, walked out of plaintiff's warehouse in a body, held a meeting later in the day, at which they agreed and conspired among and between themselves not to return to buy at the plaintiff's warehouse, and notified the plaintiff of that fact. . . . .

"That as a result of said action and conspiracy on the part of the defendant buyers a great deal of the tobacco, in fact, the greater part of it, on the floor and in the shed of the plaintiff company's warehouse for sale there was removed and taken to the other two said warehouses in the Richmond, Ky., market, for sale, and in which latter said warehouse companies some of said defendants had pecuniary interest. That growers, who had arranged to sell their tobacco at the plaintiff's warehouse, lost confidence in the market there on account of the unlawful acts of the defendants as hereinbefore described and hereinafter to be described, and naturally took their tobacco elsewhere for sale, thus unlawfully and maliciously drawing away from the plaintiff, its patrons and its business, preventing it from handling and selling many thousands of pounds of tobacco over its floors, which it would otherwise have sold, thus causing great, permanent, continuing and irreparable injury to this plaintiff. That said injurious reports originated and circulated by the defendants, and the re-

ports of said unlawful acts of the defendants have been circulated and have reached far and wide over Madison and many other counties, and to the tobacco growers of said counties, so as to have destroyed, ruined and impoverished this plaintiff in its business. . . . .

"That said combination, agreement, conspiracy and acts, as above alleged on the part of the defendants, was entered into and done by them for the purpose of wrongfully discriminating against the plaintiff in favor of the two other said warehouse companies on the Richmond tobacco market, and for the purpose of regulating, controlling and fixing the price of loose leaf tobacco; and that said combination, agreement, understanding and conspiracy was entered into by said defendants for the purpose, and having the effect, of placing the whole management and control of the loose leaf tobacco business on the said Richmond tobacco market in the hands of the Madison Tobacco Warehouse Company and the Home Loose Leaf Warehouse Company with the intent and to have the effect to limit, fix, or to establish, or to change the price and the sale of all the loose leaf tobacco on the said Richmond tobacco market. . . .

"That by reason of said unlawful and malicious agreement, understanding, conspiracy and acts of the defendants, as hereinbefore alleged, the plaintiff's trade and good will to its business has suffered permanent and irreparable injury; its business has been in effect completely destroyed, ruined and impoverished, to this plaintiff's damage in the sum of forty thousand dollars."

By consent of parties the petition was traversed of record, and thereafter the case went to trial before a jury, with the result that there was a verdict and judgment against Leech for two thousand dollars, against Thomas for two thousand dollars, against Smith and the Taylor Tobacco Co. for two thousand dollars, against Stewart and the O'Brien Company for two thousand dollars, and against Judy and the Reynolds Tobacco Company for two thousand dollars. From that judgment this appeal is prosecuted.

A number of grounds for reversal are presented by counsel for the appellants, but as we have reached the conclusion that the motion made and overruled, to direct the jury to return a verdict in their favor, should have been sustained, we will confine the opinion to a

statement of the reasons that have induced us to come to this conclusion.

Before, however, entering upon a discussion of the facts, it may be well to state the principles of law controlling cases like this, for the purpose of showing that when measured by these principles the evidence did not sufficiently show the conspiracy charged to warrant the submission of the case to a jury, although the petition stated a good cause of action.

The rule so well established that there is really no conflict in the authorities is that if two or more persons enter into a conspiracy, that is, an unlawful agreement or arrangement for the purpose of affecting injuriously or destroying the business of another person or corporation, and in pursuance of this conspiracy, and for the purpose of carrying it out, circulate, or cause to be circulated, false and damaging reports against the person whose business it is sought to injure or destroy, or commit acts tending to accomplish the object of the conspiracy and the effect of the reports or acts is to injure or destroy the business affected, the persons engaged in the conspiracy will be individually and jointly liable for the damage the aggrieved party has sustained. But the gist of the offense is the damage and not the conspiracy. Persons may enter into a conspiracy for the purpose of injuring or destroying the business of another, but unless as a result of this conspiracy the business intended to be injured or destroyed has been injuriously affected or destroyed, no cause of action will lie.

It is also well recognized that as it is extremely difficult if not impossible to establish the conspiracy by direct evidence, it is allowable to show it by circumstances of various natures, and by separate incidents and isolated acts and utterances which, although by themselves not sufficient to establish a conspiracy, yet when collected and put together are sufficient to show it. And so a wide latitude in the introduction of evidence tending to establish the conspiracy is admissible when the various facts and circumstances developed have a tendency to show the conspiracy, who the conspirators are, and their evil purpose.

It is also elementary that any person or any number of persons have the right at any time, either singly or in concert, to suspend for a time or abandon entirely their business relations with any other person, whether the

suspension or abandonment is for good cause or is the result of caprice, prejudice or malice, unless the suspension or abandonment of such relations is pursuant to a conspiracy entered into for the purpose of injuring or destroying the business of the other party and it has been injured or destroyed by the acts or conduct of the conspirators or some of them. Cooley on Torts, pages 124, 279; Ruling Case Law, vol. 5, page 1059; Brewster v. Miller's Sons Co., 101 Ky. 368; Hundley v. Louisville & Nashville R. Co., 105 Ky. 162; Van Horn v. Van Horn, 52 New Jersey Law 284, 10 L. R. A. 184; Ertz v. Produce Exchange, 79 Minn. 140, 48 L. R. A. 90; Doremus v. Hennessy, 176 Ill. 608, 43 L. R. A. 797; Boutwell v. Marr, 71 Vt. 1, 43 L. R. A. 803; Purington v. Hinchliff, 219 Ill. 159, 2 L. R. A. (N. S.) 824.

Turning now to the facts, it appears that in 1910 the Farmers Tobacco Warehouse Company was organized as a corporation and commenced business for the season of 1910-11, and continued in business during the seasons of 1910-11, 1911-12, 1912-13 and 1913-14.

In this connection it might be said that the business of this warehouse, as well as that of other companies engaged in like business, commenced about the first of December and closed about the last of February in the following year. Between February and December no business in the way of selling tobacco was carried on.

At the time the Farmers company commenced business the Madison Tobacco Company was the only warehouse in Richmond engaged in the same kind of business, but subsequently the Home Warehouse Co. was organized and commenced business, and so during the season of 1913-14 the three houses were engaged in competition with each other. It further appears that the Madison house and the Home house were situated close together at one end of the city of Richmond, while the Farmers house was located at the other end of the city, probably a mile distant.

The method of doing business in each of these houses was the same and substantially as follows: The farmers would haul the tobacco to the warehouse of their choice on wagons, and it would then be taken from the wagon and placed in open baskets on the floor of the warehouse for sale. The sales at the warehouses were conducted every day in the week except Saturday and, in order that neither house should have an advantage over the

other, the time of sale at each house alternated, so that on one day, for example, the tobacco for sale at the Farmers house would be sold first, the tobacco at the Madison house next, and the tobacco at the Home house last, and the following day the tobacco at the Home house would be sold first, at the Madison house second, and at the Farmers house third. The hours of sale were further so arranged as that the buyers of tobacco could conveniently attend the sales at each of the houses.

The sales were made by an auctioneer who cried off the basket of tobacco first in the row in the presence of the buyers, and when the bidding had been closed, the tobacco would be knocked off by the auctioneer to the highest bidder, whose name as purchaser would then be placed on a ticket fastened to the basket. The auctioneer, the buyers and other persons interested would then go to the next basket in the row, and so on until all the tobacco exposed for sale had been disposed of.

It was a further custom of the trade for each house to have what was called a sales leader whose business it was to start at a fair price each basket of tobacco as it was offered for sale by the auctioneer. When the sales leader had thus started the bidding, he would step aside and the bidding would be taken up by the buyers and continued among them until the tobacco was sold.

During the seasons of 1910-11, 1911-12, 1912-13 and 1913-14, the buyers we have mentioned attended all sales at the Farmers house as well as the sales at the other houses, and, with the exception of Thomas, it appears the most friendly relations existed between all the buyers and the officers connected with the Farmers house. In fact, there is no complaint made by the Farmers house that previous to January 29, 1914, these buyers, or any of them except Thomas, did or said anything that would tend in the slightest degree to injure the credit or standing or business of the Farmers house. The buyers had no financial interest in any of the houses, and they were buying tobacco for themselves or as agents, getting salaries or commissions.

It appears, however, that on Thursday, January 29, 1914, while the sales were going on at the Farmers house, the buyers, for reasons that will later be stated more in detail, became dissatisfied with the manner in which the sales were being conducted and all of them left the Farmers house before the sales were over, and, due to their

refusal to attend, there was no sale at the Farmers house on the following day. It further appears, however, that on Monday morning, February 2nd, the differences between the buyers and the Farmers house were adjusted in a way satisfactory to all parties, and beginning on that day all of the buyers, except Thomas, attended regularly the sales at the Farmers house until the end of the season, on February 27, 1914. In short, on Monday the business was conducted at all of the houses as it had been theretofore and all of the buyers, except Thomas, who was represented by another party, attended all of the sales until the close of the season, and there is no evidence that the buyers or any of them after they went back on February 2nd discriminated in any way against the Farmers house or said or did anything that would affect the standing or credit of the house.

Nor does it appear that these buyers or any of them, except Thomas, had any reason or motive to injure or destroy the business of the Farmers house. On the contrary, it is shown without dispute that these buyers were located at Richmond for the sole purpose of buying tobacco offered for sale in these warehouses, and it was to their interest that the relations between the tobacco sellers—the farmers and the warehouses—should be agreeable in order that the tobacco business at Richmond might be carried on successfully. It therefore appears that the reasons that usually influence persons to enter into a conspiracy for the purpose of injuring or destroying the business of another are wholly lacking in this case. If the Farmers Tobacco Warehouse Company had closed its doors, these buyers, either individually or as a whole, would not have been personally or financially benefited thereby.

Having said this much, we will now take up the occurrences of January 29, 1914, at which time, and subsequent thereto, all the facts and circumstances seized hold of by the Farmers house on which to base this action founded on conspiracy had their origin.

C. F. Chenault, a stockholder in the Farmers house, testified that Thomas said to him that he never intended to buy on another market where the houses were so far apart, and that Judy also remarked to him on one occasion that his house should get rid of Sherman Abrams as his methods were not satisfactory to buyers.

It might here be said that Sherman Abrams, who was a stockholder in the Farmers house, had been the sales leader at that house prior to the season of 1913-14, but on account of the dissatisfaction of the buyers with Abrams' methods and manner, the company at the beginning of the season of 1913-14 had secured Garnett Million as sales leader in his place, and it does not appear that the buyers had any objection whatever to Garnett Million.  It seems, however, that on January 29th Garnett Million was absent and Abrams on this day took his place as sales leader.  Chenault testifies that on this day the tobacco was not selling as well as Abrams thought it should, and after some remarks and comments by Abrams to the effect that the buyers did not know anything about their business and were not disposed to give a fair price for the tobacco, he announced that the sales would be declared off for that day, and thereupon the buyers left the warehouse before the sale of all the tobacco exposed had been concluded.

He further testified that it was customary to stop a sale at any house when the bidding was not satisfactory to the management.  He also testified that on the next day Leech, while the sales were going on at the Home Tobacco Warehouse, announced that the next sales would be on Monday, thereby publicly declaring that there would be no buyers at the Farmers house on the following day, Friday.  That on the same day, soon after Leech made this announcement, he had a talk with Judy in the course of which Judy told him that if they would agree to eliminate Abrams from the floor that the buyers would come back, but that he told Judy they could not eliminate Abrams from the floor although he would not act as sales leader again, as he had only acted on Thursday because Garnett Million, the regular sales leader, was compelled to be absent.

He says that the next conversation was on the following Monday with Miller, who was the general manager for the Taylor Company.  It seems that Miller lived in Lexington, and that when he heard of the trouble between the buyers and the Farmers house, he went to Richmond on Monday morning for the purpose of adjusting it, and, as a result of this conference between Miller and the Farmers house people, it was agreed that Abrams would not act as sales leader or floor manager

again and that the buyers would go back to the house and buy as they had been doing.

He further testified that when the trouble came up on Thursday, followed by the announcement of Leech that there would be no sale at the Farmers house on Friday, the news at once spread throughout the county among the farmers that the buyers would not attend sales at the Farmers house, and that on account of this there was a serious falling off in the amount of tobacco brought to the house for sale during the remainder of the season, although on the Monday following all of the buyers attended the sale at the Farmers house and continued to do so until the end of the season.

B. B. Million, one of the stockholders in the Farmers house, testified that Thomas told him several times before 1914 that the house was not built for a tobacco warehouse; that it ought not to run, and that Abrams would break down the house. He further said that they had removed Abrams as sales leader on account of the objection of the buyers. He also testified that Lambeth, the auctioneer at the Farmers house, told him that Thomas said that they were a lot of "cut-throats, thugs and thieves out there;" and it appears that Million asked Thomas in the presence of Lambeth if he had made this statement to Lambeth and Thomas denied it, although Lambeth insisted that he had. Million further said that Judy, on January 29, 1914, said to him after the buyers had left the house, "Well, what we have done for you is a plenty!" "I said to him, 'What do you mean, Judy?' He said, 'I will see you again and tell you all about it.'"

Million further testified that Abrams did not on the day of the trouble say or do anything that should have caused the buyers to take offense. He also testified that in another conversation with Judy between Thursday and Monday that Judy expressed regret that the thing had happened and said that he would be willing to come back, but that the others had agreed not to come back and he could not make a sale by himself.

He further said that when they failed to have a sale on Friday on account of the trouble on Thursday, "It put us out of commission." It further appears that the house was not opened during the season of 1914-15 because there seemed to be some disposition on the part of farmers not to patronize it. But as this suit was

brought before the beginning of the season of 1914-15, it may well be inferred that the officers did not intend to open the house during the season of 1914-15.

Sherman Abrams testified that he was a stockholder in the house and sales leader or floor manager during the seasons of 1911-12 and 1912-13, but had no connection with the house except as a buyer of tobacco during the season of 1913-14. That on January 29, 1914, Garnett Million, the regular sales leader and floor manager, was not present and he took his place. That on this day the tobacco was not bringing good prices and the sale was stopped before the tobacco had all been sold, and that it was customary for houses to stop sales before they were finished if the prices were not satisfactory.

A. J. House, a stockholder and director, said that he heard a conversation between Langford, also a stockholder, and an officer of the Farmers company, and Judy, after January 29th, in which Langford told Judy, in substance, that the buyers had ruined the business of the house and asked Judy the cause, and Judy replied, in effect, that they did not have any cause; that they had agreed not to come back; that he would come back if the other buyers would. He further said that the business of the house was not nearly so good after January 29th as it had been before that time.

Price Gum, a stockholder in the house, said that after the buyers left Leech told him, on January 29th, that "from the treatment we received there this morning we will not be back."

W. A. Langford, also a stockholder, said he had a conversation with Judy on the Monday following January 29th in which he told Judy that they had ruined the business of the house, and that Judy admitted the business was hurt, saying that he did not know what caused the buyers to be offended, that he had been treated well. That the buyers had agreed not to come back and he could not make a sale by himself.

J. E. Lambeth, the auctioneer at the Farmers house, said that when Abrams on January 29 started the bids the buyers would not buy, and that no person would bid except Abrams, and that after this had gone on a little while Abrams or the directors called the sale off for the day. He said that on the Friday following, Thomas said that, with the exception of Gum, Langford and Million, the balance of them were nothing but a set of

thieves and robbers, that they had robbed him more than once. It appears that this conversation between Lambeth and Thomas is the same one mentioned by Million in which Thomas was said to have made the statements attributed to him by Lambeth but which he afterwards in the presence of Lambeth and Million denied that he had made.

Jesse Cobb said that a short while after the trouble on January 29th and on the same day, he saw Smith, Leech, Judy and Thomas standing together talking, and presently Leech called up the Farmers house over the telephone and told whoever was at the telephone at the Farmers house that after the treatment the buyers had received, they would not attend the sale on Friday.

May Meeks said that he heard Stewart say in January, 1914, while they were talking about how inconvenient it was for the buyers to go to and from the Farmers house and the Madison and Home houses, that "in another year us buyers are going to get together and refuse to go to the other house—the Farmers house—without they furnish some way to take us back and forth." That he got the impression from what Stewart said that the buyers were going to get together and make the warehouse company furnish them transportation.

William Alexander said that he was a tobacco grower; that some time in January or February, 1914, he heard Thomas say that the people connected with the Farmers house were crooked, and that he also heard Leech say that he did not think he would go to the Farmers house any more.

Tom Chenault said he heard Thomas say in 1912 that the Farmers house people were a set of rascals.

D. P. Black also testified that during the season of 1913-14 Thomas said that the Farmers house was a good place to get robbed, and also advised him to take his tobacco to another warehouse as "the buyers have got it in for the Farmers house."

James Beasley said he heard a conversation between Leech and Thomas in which Thomas said to Leech, "We are going out to the Farmers warehouse this morning and what we will do for them is a plenty. They are nothing but a parcel of crooks anyway."

James Brookshire said he heard Stewart say on one occasion that "it was so inconvenient to go to the Farmers house that he would not go that day. That that

house ought to be brought over where the others were or quit business, or something of that kind.''

Other evidence was to the effect that the farmers in the country had heard about the trouble between the buyers and the Farmers warehouse and were not disposed on that account to take their tobacco to that house for sale. There was also a good deal of evidence as to the damage the business of the house had sustained on account of the acts and declarations we have set out.

The foregoing is the substance of the evidence relied on by the Farmers Warehouse Company to establish its case of conspiracy, and without setting out more of it we think it sufficient to say that as a whole it shows beyond all question that the trouble grew out of and was caused by the dislike the buyers had for Abrams and did not originate in any desire to destroy or injure the business of the house. The buyers had evidently made up their minds that if Abrams was to act as sales leader at this house or take an active part as manager of the sales, they would not buy there, and they had the undoubted right to quit for this or any other reason that they saw proper. That all of the trouble between the buyers—with the exception of Thomas—and the house was caused by Abrams, is further made plain by the compromises and settlement that were made on the Monday following between Ed Million, the president of the Farmers warehouse, and Miller, at which time it was agreed that Abrams should have no further connection with the house as sales leader or manager, and that the buyers would go back and buy as usual, and they did so to the end of the season, with the exception of Thomas.

Counsel, however, insist that the acts, manner, conversation and conduct of Abrams were not so offensive or disagreeable as to justify the buyers in the course they adopted. But, conceding this, the course they adopted did not amount to actionable wrong on their part, although it should be said in this connection that the evidence for the buyers shows that the acts, conduct and manner of Abrams were quite sufficient to furnish grounds for reasonable complaint on the part of the buyers and to excuse them for taking the action they did. The grievance of the buyers, excepting Thomas, was not against the house or its officers or management. It was against Abrams, and we think it very clear that any man or set of men have a right to sever business re-

lations with any establishment because of objection to any person connected with it.

It is also entirely probable, and we so assume, that the Farmers house sustained damage when it became known among the farmers and raisers of tobacco that the buyers left the house in a body on Thursday and announced that they would not attend the sale at this house on Friday. But this admission is far from establishing any conspiracy on the part of the buyers to injure or destroy the house, when the circumstances that influenced them to take the action they did are considered. The fact that the Farmers house sustained damage on this account, which damage was undoubtedly aggravated by the conduct of its officers in bringing the suit immediately after the close of the season in 1914 without waiting to see whether the buyers would exhibit any ill-feeling or resentment towards the house in the season of 1914-1915, does not warrant a judgment against these buyers in the absence of some evidence that they entered into a conspiracy for the purpose of injuring or destroying the business of the house.

Neither are the buyers to be held responsible either individually or collectively for what Thomas said or did, as there is no evidence that he spoke for them or that they encouraged or approved his acts or declarations. Thomas, it seems, had some grievance of his own against the managers of the house, or at least some of them, and, according to the evidence, did not take any pains to conceal it.

So that, putting aside the acts and declarations attributed to Thomas, there is no evidence that the other buyers, either singly or together, were actuated by any purpose to injure or destroy the business of the house; nor did they singly or together indulge in any declarations or commit any acts that would amount to actionable conspiracy or furnish a basis for individual liability.

At the most and when all is said, the sum and substance of the evidence is that the buyers entered into an agreement that they would not attend the sales at the Farmers house if Abrams had anything to do with them in the capacity of floor manager or sales leader, and this course the buyers had the right to pursue.

We are, therefore, of the opinion that the motion for a peremptory instruction made by the buyers, as well

as by the Taylor Tobacco Co., the O'Brien Tobacco Co., and the Reynolds Tobacco Co., should have been sustained, except as to Thomas.

The fact, however, that the Farmers house failed to make out a case of conspiracy against the buyers as a body did not deny it the right to recover against Thomas in this action under instructions properly submitting the case as to him, because the evidence we have set out as to the declarations made by Thomas furnished grounds on which to rest a cause of action against him, although, of course, we express no opinion as to what should be the result of a suit between the Farmers warehouse and Thomas. We only say that the declarations testified to have been made by him were sufficient to support a cause of action for injury to the business of the house, as a person may be sued in slander for uttering words that are calculated to and do injure the business of another; Townshend on Libel and Slander, 3rd ed., section 182; 25 Cyc. 337; Gross Coal Co. v. Rose, 126 Wis. 24, 2 L. R. A. (N. S.) 741; Continental Realty Co. v. Little, 135 Ky. 618; Pennsylvania Iron Works Co. v. Henry Voght Machine Co., 139 Ky. 497; Axton-Fisher Tobacco Co. v. Evening Post Co., 169 Ky. 64; Fred v. Taylor, 115 Ky. 94. And the Farmers house had the right to have submitted to the jury in this case under appropriate instructions the cause of action made out against Thomas, although it failed to show a conspiracy.

The Farmers house did not, however, ask any relief against Thomas individually or seek, during the progress of the case, to hold him personally liable, preferring to rest its case on the joint cause of action set out for conspiracy; but on a return of the case if there is another trial and there should again be a failure as on the last trial to show a conspiracy entered into by the buyers, the case may go to the jury against Thomas alone if the evidence as to him is in substance the same as appears in this record. We say this because it is a well recognized rule that "though a conspiracy is charged, yet if on the trial, the evidence connects but one person with the wrong actually committed, the plaintiff may recover against him as if he had been sued alone." Cooley on Torts, page 126; Van Horn v. Van Horn, 52 N. J. L. 284, 10 L. R. A. 184; Hutchins v. Hutchins, 7 Hill (N. Y.) 104; Parker v. Huntington, 2 Gray (Mass.) 124; Young

v. Gormley, 119 La. 546; Fillman v. Ryon, 168 Pa. St. 484; Brackett v. Griswold, 112 N. Y. 454.

Wherefore, the judgment is reversed, with directions to proceed in conformity with this opinion.