# Turner v. Linton, and eight other cases.

(Decided Oct. 22, 1937.)

298

JOHN K. SKAGGS, Jr., VAN WINKLE & SKAGGS, J. M. SCAR-BOROUGH and WILLIAM T. LASLEY for appellants.

TRIMBLE & TRIMBLE, HUGH LINTON, E. J. FELTS, O. M. SMITH, JAMES C. LAYNE, G. SAMUEL MILAM and J. W. LINTON for appellees.

OPINION PER CURIAM.

The appeals in these nine cases are taken from judgments of the Logan circuit court. The cases were tried before Hon. John B. Rodes, sitting as special judge for this purpose. Judge Rodes has written a careful and full opinion, in which we concur, and we adopt such parts as we deem necessary to a disposition of these appeals. He said:

"The above nine election contest cases were all heard and tried together. The evidence was heard orally, subsequently transcribed by the official stenographer, and I have had the benefit of the record. The petitons substantially charge the same grounds of contest. Concisely stated, these grounds are as follows:

"(1)   A conspiracy to violate the Corrupt Practice Act [Ky. Stats. sec. 1565b-1 et seq.] by the use of money in the purchase of votes; the expenditure of a larger sum of money than is permitted by that act, coupled with a pooling of such money for such illegal purposes; in order to make effective this conspiracy for the purchase of votes with money, a system of the use of official ballots was established, commonly known as the chain ballot system.

"(2)   A conspiracy to cause the county court clerk, Riley, to fraudulently manipulate the registration books and to incorrectly copy and alter same and to make incorrect lists of the persons registered and entitled to vote.

"(3)   A conspiracy to intimidate numerous persons legally entitled to vote and to prevent them from voting, and, further, by offering to build highways in certain portions of the county as an inducement to voters to cast their votes in favor of the contestees.

"(4)   A conspiracy to permit persons neither blind nor physically disabled to vote upon the table, in order that contestees might know how the voter cast his vote; and to cause to be registered as voters a large number of persons not entitled to vote.

"'There were other acts mentioned not necessary now to be referred to, but which will be referred to later on. In view of the fact that a conspiracy was charged, the evidence took a wide field. Much of the record is devoted to the question of whether there were two groups, slates, or tickets in the field, and the contestees are inclined to protest that the so-called Rhea ticket had no existence except in the minds of their opponents. But it may confidently be said there were two tickets or groups, one against the other, the members of which, with a few exceptions, supported and voted for each other. Their designations are unimportant, whether called Rhea and anti-Rhea or Rhea and Chandler or Rhea and Coke or Honest Election League. Contestants admit the fact of the organization of their group under the style of anti-Rhea candidates, for the purpose of opposing all other candidates as a group. When a number of candidates group themselves to oppose others, it is almost inevitable those others will likewise group for mutual support. This they have the right to do, provided they stop short, in their mutual efforts, of engaging in unlawful practices, nor is the unlawful act of any member of any particular group to be attributed to the rest unless done with their knowledge or under such circumstances as that knowledge and consent may be logically and reasonably inferred.

"The doctrine of 'imputed knowledge' was rejected by our Court of Appeals in the case of Prewitt v. Caudill, 250 Ky. 698, 63 S. W. (2d) 954, 963, where it was said: 'The common meaning of imputed knowledge or liability is to attribute it to one on account of another or to hold one vicariously responsible for the knowledge of another, such as a principal and agent. The legal doctrine of imputed knowledge of conditions necessarily rests upon the duty to know or the assumption of responsibility for the undisclosed acts of another. The Corrupt Practice Act does not fasten liability upon the candidate by the application of that doctrine. It does, of course, permit the courts to infer a knowledge on the part of a candidate from evidence showing that he was aware of certain facts and circumstances. That is but to recognize proof of actual knowledge by circumstantial evidence.'

"The grouping of a number of candidates for mutual support by lawful means does not itself constitute an unlawful conspiracy. A conspiracy, to be unlawful, must be a common agreement to use unlawful means, or means not unlawful to gain an unlawful end. See Leech v. Farmers' Tobacco Warehouse Co., 171 Ky. 791, 188 S. W. 886.

"No such conspiracy is proven by this testimony.

"The major charge is one of bribery by the purchase of votes, but the record wholly fails to establish any common fund for that purpose, or indeed, for any purpose, to which all the candidates of the Rhea ticket or any two or more of them contributed. Sample ballots were printed showing cross-marks in the squares opposite the names of the contestee candidates. This was done by John A. Whitaker, contestee candidate for county attorney, and there is no proof that other candidates authorized or joined in it. The use of such a sample ballot was not unlawful, any more than those furnished by the county clerk for which the law provides.

"If any sample ballot was folded and used to conceal a bribe, the evil lies not in the paper, but in the corrupt purchase of votes with money. Even though all the contestees had authorized and helped to pay for the Whitaker sample ballots, yet none of them can be held accountable for the corrupt use of same unless this was done with their knowledge or consent. Each contestee then remains liable for his own conduct and the conduct of his supporters of which he knows or where his knowledge may be reasonably inferred. The same thing may be said of any fraudulent act of the county court clerk with reference to the registration books or to the threats or efforts to intimidate on the part of any particular candidate (if any such existed), unless shown to have been with the knowledge and consent of another; or the other candidates. As I view these contests, they require a consideration of each particular case and the acts of each particular candidate who is a contestee or defendant herein; but there are some general questions and charges mentioned which may be disposed of, as they refer more or less to more than one candidate, and should be

swept away before we reach the major charge of bribery.

"It is alleged that the contestees, or some of them, with their supporters, fraudulently engaged in litigation for the purpose of controlling the election and obtaining illegal votes.

"It appears that the anti-Rhea group had obtained control of the county Democratic executive committee. On July 26, 1937, Whitaker and McEndree filed a petition in the Logan circuit court, No. 8,398, against the board of election commissioner and the county court clerk, by which they sought to prevent the purgation of the registration books and the cancellation of a long list of registered persons said to have been illegally registered. It was alleged that the list had been selected by the county Democratic executive committee when no quorum was present, etc. A temporary restraining order was secured, no answer was filed, and no purgation had.

"On August 2, 1937, B. A. Evans and others filed a petition in the Logan circuit court, No. 8,401, against the board of election commissioners of Logan county and W. C. Campbell, to prevent the qualification of said Campbell, who had been appointed to supply the place made vacant by the death of Mr. A. G. Rhea. A restraining order was secured and the matter was taken to the Court of Appeals, before Judge Thomas, who on August 6, 1937, rendered an opinion which settled this matter. Judge Thomas ruled that W. C. Campbell should be qualified, but that the election officers already selected should not be interfered with.

"On August 3, 1937, John A. Whitaker and others filed a suit in equity, No. 8,403, against J. Guthrie Coke, chairman of the Logan county Democratic executive committee, to require him to select and certify for appointment certain named challengers requested by a certain group of candidates. On August 4, 1937, a hearing was had at Greenville, Ky., and Judge Doyle Willis made a mandatory order to that effect.

"In so far as this litigation is concerned, it may be said that it represents but a characteristic struggle between two groups for supposed advan-

tage and control, or to prevent supposed attempts to gain unlawful advantage. In such a hard-fought contest such struggles are frequent. We cannot see that this litigation in any way affects the election. We may say here that the conduct of the election officers actually appointed appears to have been unusually regular. So far as the record discloses, they were honest men and attempted to fulfill their duties.

"The testimony shows that (excluding the charge of bribery) there were very few illegal votes cast; and it cannot be successfully maintained that there was any fraud conducted within the polling places on the part of the election officers. If this is true, it is immaterial whether they were appointed before Mr. Campbell was qualified as an election commissioner, or after.

"On the whole, the challengers appear to have conducted themselves properly, at least within the polling places, and the same may be said as to them. Indeed, in so far as the polling booths are concerned, or the conduct of the election officers, the election appears to have been remarkably free from controversy or fraud. There is no charge that the counting of the votes was in any way incorrect. There is a charge of intimidation and threats, but it is not shown that any voter was thereby deterred from voting or that he refrained from entering the polls on that account. The election was free from disturbances and violence. In several precincts were stationed highway patrolmen, but they in no way interfered with the election. Evidently they were present as observers, and if they witnessed any threats or violence of any kind it is not shown in the testimony.

"In Keysburg precinct, Joe Ivey says that Mose Riley, an officer of the election, brought a pistol with him and placed it in a drawer upon his arrival and said that there was to be no damn foolishness about this election. But it is not shown that the pistol was ever used thereafter or, indeed, ever taken out of the drawer or exhibited thereafter. Nor is it shown that any of the other officers of election were in any way intimidated thereby, and Ivey, according to his own statement, was not himself. Gilver Ashby says that in Homer pre-

cinct Sheriff Steward told him threateningly, in substance, 'We will know what you do'; but it is not shown that Ashby was in any way intimidated thereby from voting his sentiments.

"It is charged that four candidates for coroner were 'dummy' candidates, and that the contestees procured them to run in order to obtain an advantage in the selection of election officers and challengers. This appears to be merely a surmise from the fact that such candidates for coroner joined with the Rhea group or ticket in requesting officers and challengers, thereby giving them more than 50 per cent. It is well known that candidates for coroner are numerous these latter years in Kentucky, and it is not shown that any contestee candidate exerted pressure upon the four named candidates for coroner, who are called 'dummy candidates,' to get them to stand for election. But the final answer to this is that set out above. The election officers apparently were honest in their demeanor and, so far as shown, substantially fulfilled their duties. Any advantage gained by lawful means and resulting in no unlawful or fraudulent practice cannot be considered as evidence of an unlawful conspiracy.

"It is charged that contestee candidates offered to build roads in the county in order to obtain votes in certain sections. In any election where magistrates and a county judge are to be selected, particularly where the present county judge stands for re-election, it is but natural that a renewed activity in the building of highways should be observed; but there is no evidence of any agreement to build a highway conditioned upon any definite persons voting for any definite candidates, nor that any unnecessary road was built.

"It is charged that the contestees were using the schools of the county to advance their prospects for election, and considerable evidence is taken as to whether Jesse L. Riley, contestee candidate for county clerk, said on certain occasions that the schools in Logan county were in politics and declared to one of the teachers that she would see 'who was who' in Logan county. It is not shown that these statements, if made, were participated in or authorized by any other candidate, or that such statements, if considered as threats, had any

result. If Riley made the statement to Mr. Hugh Dawson that the schools were in politics, it appears that none of Mr. Dawson's four daughters have been deprived of their positions, as three are still teaching and the fourth is not teaching only because of her illness.

"It may be natural for Miss Elizabeth Holman (daughter of Mr. C. C. Holman) to attribute her relocation at Parson's Camp Ground instead of her home place at Adairville, to politics, inasmuch as she was in favor of the anti-Rhea ticket; but the fact remains that her complaint rests only upon the last-named school being further removed from her home than the first, while the salary she receives is the same.

"It may be natural for Miss Mary Rice Mimms, of Olmsted, to attribute the failure of the county school board to re-elect her as a teacher to politics, but the facts appear to be that there is no evidence of any contestee candidate ever exerting any pressure or influence upon the members of the county school board or that the county school board in any way acted unworthily or not from a sense of the duties devolving upon them. Nor can any conclusion be reached as to the county school superintendent that he acted otherwise than from a sense of duty. It appears that there were more applications to teach in Logan county than there were positions, and someone necessarily must fail of election. There is no property right in a teacher's job to continue beyond the period of her employment. If Jesse Riley made the improper statements attributed to him, it is not shown that they were participated in by another contestee candidate or authorized by him, nor that they in any way influenced the county board of education.

"It is charged that there was fraud committed because numbers of persons physically able to vote themselves, voted upon the table and without being sworn as required by law; that there were numbers of persons from the state of Tennessee and adjoining counties of Kentucky that were illegally permitted to vote, and that the so-called chain system of ballots was employed in order to effectuate the bribery that was indulged in.

"The proof as to all of these matters last above referred to is meager and inconclusive. It is certain, in any event, that very few illegal votes from the state of Tennessee or from adjoining counties were permitted to be cast."

The direct evidence regarding the casting of illegal votes or of "chain voting" is mostly vague and such as is circumstantial is largely rebutted by the fact that armed patrolmen were present in practically all precincts where trouble was anticipated, but no arrests were made. An examination of the evidence asserted by appellants to demonstrate the incorrectness of the trial court's conclusions fails to convince us of its error in this particular.

"It is said that the county clerk, Jesse Riley, manipulated the registration books and was guilty of fraud in making out his lists therefrom, and that he sent out an unlocked copy of a registration book to the polls and induced the election officers to permit him to introduce a certificate of registration, which was not at first included in said book, and that he fraudulently altered the political affiliation of the voters upon the lists made out by him and furnished to the various voting places. The latter statement stands unproved. The registration books were all on hand and could all have been compared with the major registration book kept in the county court clerk's office. It is not shown that the political affiliation of any name on the lists sent out by the county clerk differed from the registration book itself. It appears that in Schochoh precinct the election officers permitted Jesse Riley to send for a registration certificate which it was claimed had been omitted from the registration book, and when it was returned to the voting place the voter cast his vote thereunder. This was improper, but the election officers appeared to have acted in good faith and there is nothing to show that Riley, the county clerk, was untruthful when he said that this registration certificate had been omitted from the book by mistake. It is said that this particular registration book was unlocked and that this particular registration certificate was thereby enabled to be inserted in the book with the others. Others say that it was merely placed inside the book and that the book itself was not unlocked.

"All these contests narrow down to the question of a violation of the Corrupt Practice Act by the purchase of votes with money. In effect, this conclusion sustains the motion of contestees to strike all evidence not relating to a violation of that act, though this has little practical effect upon our consideration of these cases and the conclusions reached."

The learned special judge pointed out the failure of the evidence to sustain any finding that six of the contestees were in any way advised of or connected with the frauds alleged to have been perpetrated. No useful purpose can be subserved by quoting this portion of his opinion, although it has been most helpful to us in a consideration of the tremendous record.

As to three of the contestees, Emerson Beauchamp, Jesse L. Riley and John A. Whitaker, candidates for sheriff, county court clerk, and county attorney, respectively, the evidence shows that each was present and actively working at the polls on the day of the primary. Witnesses were introduced who testified directly to bribery.

After setting out that the burden of proof was on the contestants, that mere suspicion of wrongdoing was not enough to justify a court in setting aside the choice of the people at an election, and that credible testimony of knowledge or consent to illegal practices was essential, the opinion considers each of the three cases saying:

"If any one of these candidates gave money to voters for corrupt purposes, his certificate of nomination must be canceled. Let us take up each of them, in order.

"Emerson Beauchamp was at Schochoh.

"Willie Crosley testifies that William Gill paid money to John and Charles Trent behind the blacksmith shop at Schochoh.

"James Doss, a colored man, testifies that one Bob Blanton gave him a dollar to vote for the Rhea ticket, and that he voted for Mr. Tom Rhea.

"Remus Jackson, a colored man, testified that Dock Blanche (he may have meant Bob Blanton) gave him money to vote the Rhea ticket and he also voted for Mr. Tom Rhea.

"Lee Taylor testifies that Beauchamp gave him $20 to work for him at Adairville, and that while he bought no votes himself, yet he sent men to Virgil Owens for the pay-off.

"Beauchamp denies that he gave any money to Taylor or to William Gill or to anyone else for use in the election, or that either Taylor or Virgil Owens were working for him in the election. William Gill says he had no money and gave none to John or Charles Trent anywhere. The Trents do not testify. It is not shown that Beauchamp had any knowledge of the gift of money to John and Charles Trent, if they received any. Crosley has twice been a convict and his reputation for truth and veracity is successfully impeached by good and reputable citizens. Under this, the evidence certainly does not preponderate against Beauchamp as to this incident.

"Beauchamp declares he knows nothing of the payment of any money to the two negroes, James Doss and Remus Jackson. Bob Blanton does not testify. But Doss and Jackson are thoroughly discredited and impeached as to truth and veracity by good and reputable citizens.

"Beauchamp denies that he gave Lee Taylor $20 or any sum to work for him at the Adairville precinct, and Virgil Owens denies that he was working at all on the day of the election and, on the contrary, was clerking in the store in Adairville where he was employed on Saturdays. Owens further says that he handled no money and gave nobody any money. Taylor cannot remember the men whom he says he sent to Owens, except four, and these four do not testify. Owens denies giving these four any money whatever. Taylor further labors under this rather discreditable situation: It appears if he testifies truthfully, that he was taking money from both sides; that he received $10 from contestant Johnson and $20 from contestee Beauchamp. Are we to believe Taylor against Beauchamp and Virgil Owens, even though Beauchamp is an interested party?

"Under this testimony we cannot reach the conclusion that Beauchamp was guilty of corrupt practices on the day of the election.

"As to Jesse Riley. Riley was at Olmsted precinct. Wes Kennedy testified that Riley gave him $3 for his vote.

"Raymond Violet testified that Riley offered him $7 for the votes of himself and wife, but gave him nothing, and that thereafter Ed Gill paid him $4, after he had voted.

"Burley Robertson testified that Riley gave him $2.50 after he had voted.

"Riley denies in each instance that he gave any of these men any money at all, or that anybody was handling any money for him at that time or in that precinct. Ed Gill was a friend and supporter, but Gill denies that he was a worker at all, and denies specifically that he had any money or that he gave any to Raymond Violet.

"Now, Kennedy and Violet and Burley Robertson are all successfully impeached for truth and veracity by good and reputable citizens. Even though Riley is an interested party, and taking that into consideration, are we to believe these three discredited men against the positive denials of Riley and Ed Gill.

"I must bring this evidence to the bar of a discriminating judgment and weigh it accordingly, and when I do so I cannot convict Riley of a violation of the Corrupt Practice Act.

"As to Mrs. Hester Hunter. Mrs. Hunter was at Oakville precinct, and her testimony is mentioned on account of her close connection with Riley, being a deputy in his office. Jess Rigsby testifies that Mrs. Hunter told him that Mutt Todd would take care of him, and that thereafter Mutt Todd dropped a dollar on the ground near his feet, which he picked up and placed in his pocket.

"Herbert Flowers states that Mrs. Hunter was handling folded sample ballots on the day of the election.

"Elvis Robertson testifies that Mrs. Hunter suggested that the wife of George Robertson vote as the wife of Elvis Robertson.

"Carl Stratton testifies that Neil Grayson gave him $1 and an additional sum of $1 each for his brother and brother-in-law, Prince.

"Mrs. Hunter denies she made the suggestion to Elvis Robertson; but if made it does not appear to have been carried out. She denies that she was using folded ballots, but rather that they were rolled ballots. She denies that she referred any voter to either Mutt Todd or Neil Grayson, or Judge O'Brien. Judge O'Brien appears to be a rather mysterious figure, as he does not testify and is said to have been an anti-Rhea worker or supporter. Mutt Todd denies that he dropped any dollar on the ground in the presence of Jess Rigsby or that he had any money or gave any one any money. Indeed, he denies that he was a worker at that election at all. Neil Grayson denies that he gave Carl Stratton or anyone else any money, or that he was a worker on the day of the election at all. Here are Rigsby and Stratton on one hand, both of whom confess themselves willing to be bribed, and on the other Mrs. Hunter, Mutt Todd, and Neil Grayson. Again, I cannot reach the conclusion that the weight of this testimony establishes bribery with the knowledge of either Mrs. Hunter or of Jesse Riley.

"John A. Whitaker was at Russellville precinct No. 3 the greater part of the day, in his automobile and near the election booth or polling place. As to Russellville precincts Nos. 3 and 4 there is considerable testimony. One witness declares that candidate Whitaker gave him money, and he is Herman Atkinson by name. Atkinson discredits himself by stating that he voted at Auburn and then came to Russellville to pick up any money that he could. He was willing not only to sell his vote but to deceive and to defraud another in doing so. He testifies that he asked Mutt Chaney, near the polls, if there was any money in it that day. Chaney referred him to John A. Whitaker, sitting in his car about 30 feet distant. Atkinson says that on his coming to the automobile of Whitaker he was given $1, and that he later returned, saying that he had two or three friends to take care of, and that Whitaker gave him $2 more. Chaney, who was blind in one eye and had about 50 per cent. vision in the other, claims that Atkinson returned to him and showed him a paper bill which he had just received. Whitaker denies the incident, in so far as

giving Atkinson any money is concerned. He says it is true that Atkinson came to his car and inquired whether he could vote in Russellville, and was informed that he could not and was finally told to get on away. Whitaker says that Luther Greer, a carpenter, was in the car at the time. Greer appears to be a reputable man, and he testifies that he was present when Atkinson came to the car, and he supports Whitaker that no money was given Atkinson. Greer says that Atkinson was drinking at the time, and G. Sam Milam says that while driving in his car about noon of the same day he was approached by Atkinson, who was evidently drinking at the time. The weight of the testimony as to this incident is with Whitaker and Greer.

"Herman Atkinson had a sister named Mary Tempie Atkinson, a 17 year old girl, who claims that Mike McEndree told her to go to the polls in Russellville and vote. She does not claim that anybody promised her money, but does claim that she actually voted, notwithstanding she was not registered and only 17 years of age. No one testifies that she voted except herself. If she did vote, how she got by the challengers and election officers is not shown. In voting she states she did not read the names upon the ballot and can only remember the name of Judge Linton. After she had voted she says that Willie T. Thomas came to the car in which she was sitting with three others and gave her a dollar. The three others do not testify. There is considerable doubt hanging over the testimony of this witness, and there is no showing that Whitaker had any knowledge of the incident, if it happened.

"Douglas Johnson, contestant candidate for sheriff, was at this precinct on the day of the election and claims that he saw John Merritt, a negro worker, place dollar bills in sample ballots and fold them together and give them to several voters. He testifies he was within 5 or 6 feet of them when he distinctly saw the thing occur. He had been a deputy sheriff. He knew he had the right to place these men under arrest, and certainly he was interested in doing so. He did not do so, and did not report the incident to any of the challengers or officers of election. Johnson further admits that he made no attempt to spot the corrupt voters or to

ascertain their names. His conduct is hardly consistent with a genuine belief that whatever happened represented the giving or taking of a bribe.

"Much of the same thing can be said as to the testimony of Isaiah Deshazer. Deshazer says that he saw John Merritt pass money to unknown voters in his plain view. He claims that the parties were unknown to him, although he had been chief of police, in Russellville in former years. He was sheriff at this polling place, and claims that he permitted these persons whom he had seen Merritt bribe with money to enter the polling place. He did not challenge them, and made no effort to prevent their voting. He claims that he entered the adjoining booth and peeped at them and saw them take money from the folded ballot. If this happened, he had positive proof of the bribery, and yet, notwithstanding he was sheriff of the election, he made no attempt to prevent it or to place them under arrest. Neither is his conduct consistent with a genuine belief at the time of actual bribery. In the case of Scalf v. Pursifull, 250 Ky. 447, 63 S. W. (2d) 504, 507, Judge Thomas has commented himself, upon such conduct: 'The law-abiding citizen might inquire why the actually proven (and frequently confessed) guilty bribers of voters, either with or without the knowledge of the candidate, are not apprehended and prosecuted, and which query has often suggested itself to us. The docket of this court in recent years has been largely filled with election contest cases, and in each of which it is proven that certain individuals, posing as friends of a particular candidate or group of candidates, remained at a precinct throughout the opening of the polls actively engaged in corruptly buying votes for the candidate or group of candidates; but it is rare indeed that such persons are ever indicted or any effort made on the part of enforcement officers to arraign them before the bar of justice. If such derelictions were corrected and the proven bribers vigorously prosecuted, it would go far toward the accomplishment of the purpose of our Corrupt Practice Act, notwithstanding the evidence may be insufficient to charge the candidate with knowledge of such practice.'

"Leslie Whitaker, tenant on the farm of con-

testant Duncan, testifies that he saw Jack Arnold, who was a worker that day for candidate Whitaker, pay to Wilbur Young, his brother-in-law, and to three ladies a dollar each. The ladies are not named. He claims to have witnessed this transaction across the street.

"J. J. Markham, a brother-in-law of contestee Duncan, claims that he saw at the same precinct Jack Arnold pay to Delbert Morris money, which transaction he witnessed across the street.

"Mrs. W. A. Duncan testifies that she saw Mike McEndree give money to Willie T. Thomas and also to two colored boys.

"Jack Arnold testifies and admits that he was a worker for John Whitaker at the polls on that day, but denies that he gave his brother-in-law, Wilbur Young, any money; and Wilbur Young supports him in that statement.

"Delbert Morris also testifies and denies that Jack Arnold gave him any money at all. McEndree testifies that he handled no money and gave no money to anyone. Whitaker denies that any of these men handled any money for him, or that he had any knowledge of the transactions or incidents referred to; that he saw nothing of them nor were they brought to his attention at the time. I have already indicated that no great reliance can be placed upon the testimony of Herman Atkinson, and that I am not disposed to give much consideration, for the reasons set out above, to the testimony of Douglas Johnson and of Isaiah Deshazer. The rest of the testimony relating to this precinct, or these two precincts, is contradictory and uncertain. I am unable to say, from a preponderance of the testimony and giving every witness the due weight his testimony should have, and taking into consideration the interest of the candidate, that bribery with the knowledge of such candidate has been established. It is not sufficient that a strong suspicion of bribery has been created. The evidence must be carefully weighed, its credibility measured, and its probative value determined. I am unable to find that it is sufficient.

"There is other testimony, not only in these but in other precincts, but I can not refer to it all.

I have endeavored to refer to the main testimony of the case.''

Appellants argue that we must lend weight to the absence of numerous witnesses whom they say it was the duty of contestees to produce, and that the special judge referred to several witnesses as having been impeached or discredited when in fact this was not the case. It must not be overlooked that there is a practical difficulty in cases of this character in locating or producing all witnesses for the defense in the short period after the contestants' hand has been disclosed and the time when the defendants must introduce their evidence. The contestants testified that they had no personal knowledge of violations of the law. They were asked on cross-examination where they obtained their information and were unable to tell. It is not flattering to the character of appellants' witnesses that the contestees were able to produce such a large amount of impeaching testimony in so short a time. That certain of the witnesses are not directly impeached adds little to the congenital incredibility of their stories. The trial judge saw and heard these witnesses, and we are confident that he did not err in appraising their testimony.

The judgment in each case is affirmed. Mandate will issue immediately without prejudice to petition for rehearing.

Whole court sitting except Judge Baird, who was absent.